UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK

_____

In re:

    JEFFREY D. MENOFF and
    LORI L. MENOFF,                Case No.: 19-11693-CLB

                Debtors.

_____


# DISCLOSURE STATEMENT OF
# <u>JEFFREY D. MENOFF AND LORI L. MENOFF</u>


**THIS DISCLOSURE STATEMENT AND THE PLAN OF
REORGANIZATION WHICH IS BEING SENT TO YOU
CONTEMPORANEOUSLY WITH THIS DOCUMENT CONTAIN
INFORMATION THAT MAY BEAR UPON YOUR DECISION TO
ACCEPT OR REJECT THE PLAN PROPOSED BY THE DEBTORS.
<u>PLEASE READ THIS DOCUMENT WITH CARE.</u>**


Dated: Clarence, New York
      November 6, 2023

**LIPPES MATHIAS LLP**
Daniel F. Brown, Esq.
*Counsel for the Debtors*
9145 Main Street
Clarence, New York 14031
Direct Dial:  (716) 235-5030
Facsimile:  (716) 565-1920
E-mail:  dbrown@lippes.com

THIS DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") IS BEING SUBMITTED TO YOU BY JEFFREY D. MENOFF AND LORI L. MENOFF (THE "DEBTORS") IN AN EFFORT TO SOLICIT YOUR VOTE FOR THE DEBTORS' PROPOSED PLAN OF REORGANIZATION (THE "PLAN"). ALL CREDITORS ARE ENCOURAGED TO READ AND TO CAREFULLY CONSIDER THIS ENTIRE DISCLOSURE STATEMENT, THE DEBTORS' PROPOSED PLAN OF REORGANIZATION AND THE MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT UNDER "RISK FACTORS" PRIOR TO SUBMITTING BALLOTS PURSUANT TO THIS SOLICITATION.

THE DEBTORS BELIEVE THAT THE APPROVAL OF THE PLAN IS IN THE BEST INTEREST OF CREDITORS. ALL CREDITORS ARE URGED TO VOTE IN FAVOR OF THE PLAN. VOTING INSTRUCTIONS ARE CONTAINED AT PAGES 3 AND 4 OF THIS DISCLOSURE STATEMENT. TO BE COUNTED, YOUR BALLOT MUST BE DULY COMPLETED AND EXECUTED AND EITHER ELECTRONICALLY FILED WITH THE BANKRUPTCY COURT'S CM/ECF SYSTEM OR RECEIVED BY THE UNITED STATES BANKRUPTCY COURT, WESTERN DISTRICT OF NEW YORK, OLYMPIC TOWERS, ROBERT H. JACKSON UNITED STATES COURTHOUSE, 2 NIAGARA SQUARE, BUFFALO, NEW YORK 14202, BEFORE ___:___ ____.M., EASTERN DAYLIGHT TIME, ON _____ _____, 2024.

NEITHER THE SECURITIES & EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED THIS DISCLOSURE STATEMENT AND NONE OF THE FOREGOING HAS PASSED ON THE ACCURACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE IN FAVOR OF OR AGAINST THE PLAN. ALTHOUGH THE DEBTORS HAVE USED THEIR BEST EFFORTS TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN, THE DEBTORS ARE UNABLE TO WARRANT THAT THE FINANCIAL INFORMATION CONTAINED HEREIN CONTAINS NO INACCURACY. CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS, BY ITS NATURE, FORWARD-LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS AND PROJECTIONS. THERE CAN BE NO ASSURANCE THAT ANY FORECAST OR PROJECTED RESULTS CONTAINED HEREIN WILL BE REALIZED AND ACTUAL RESULTS MAY BE MATERIALLY DIFFERENT FROM THOSE SHOWN.

# TABLE OF CONTENTS

I.  INTRODUCTION ...................................................................................................... 1

    A.    Purpose of Disclosure Statement ...................................................... 1

    B.    Definitions................................................................................................. 1

    C.    Sources of Information .......................................................................... 1

    D.    Filing of Reorganization Case ............................................................ 2

    E.    Confirmation of Plan............................................................................. 3

        1.    Solicitation of Acceptances................................................... 3

        2.    Manner of Voting on Plan...................................................... 3

        3.    Persons Entitled to Vote on thpe Plan................................. 3

        4.    Hearing on Confirmation of Plan......................................... 4

        5.    Acceptances Necessary to Confirm Plan ........................... 4

        6.    Cramdown:  Confirmation Without Acceptance by All
                Impaired Classes ...................................................................... 4

II.  THE EVENTS LEADING UP TO THE FILING OF THIS CASE AND THE
DEBTORS' POST-PETITION REORGANIZATION EFFORTS .............................. 5

    A.    Pre-Petition Events................................................................................ 5

    B.    Post-Petition Reorganization Efforts. .............................................. 7

III. SUMMARY OF THE PLAN............................................................................... 9

    A.    Overview.................................................................................................. 9

    B.    Administrative Expense Claims.......................................................... 9

    C.    Unsecured Priority Claims................................................................. 10

    D.    Treatment of Pre-Petition Claims and Interests. ....................... 10

        Class 1:    Secured Claim of Community Bank, N.A. for Mortgage
                       on Debtors' Residence and Arena........................................ 10

        Class 2:    Secured Real Property Tax Claim of Town of Persia
                       on Debtors' Residence and Arena........................................ 10

        Class 3:    Secured Claim of Ford Motor Credit Company for 2015
                       Ford F350............................................................................... 10

        Class 4:    Secured Claim of Ford Motor Credit Company for 2018
                       Ford F150............................................................................... 11

        Class 5:    Secured Claim of Manufacturers and Traders Trust
                       Company for 2015 Ford Focus ........................................... 11

        Class 6:    Secured Claim of Patterson Companies for Promax
                       Panoramic X-Ray Machine.................................................. 11

        Class 7:    Secured Claims of Internal Revenue Service..................... 12

Class 8:    Disputed Secured Claims of New York State
        Department of Taxation and Finance. .................................................. 13

Class 9:    Unsecured Claims. ................................................................................... 14

E.    Disputed Claims and Avoidable Transfers. ............................................................ 15

F.    Assumption and Rejection of Leases and Executory Contracts. ........................... 16

G.    Sources of Distributions and Funding of Future Operations Under
the Plan. .................................................................................................................. 16

H.    Method of Making Distributions Under the Plan. ................................................. 16

1.    Cash Distributions. ................................................................................ 16

I.    Effects of Confirmation. ........................................................................................ 17

1.    Vesting of Assets. .................................................................................. 17

2.    Confirmation Injunction/Permanent Injunction. .................................... 17

3.    Post-Confirmation Matters ..................................................................... 18

4.    Discharge of Debtors. ............................................................................ 18

IV. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ...................... 19

A.    General. ................................................................................................................... 19

B.    Federal Income Tax Consequences to the Debtors. .............................................. 19

1.    Reduction of the Debtors' Indebtedness. ............................................... 19

C.    Federal Income Tax Consequences to Holders of Claims. ................................... 20

1.    Holders of Claims. ................................................................................. 20

V.  CONFIRMABILITY OF THE PLAN ............................................................................... 20

A.    General. ................................................................................................................... 20

B.    Liquidation Analysis of the Debtors' Assets/Best Interests of
Creditors. ................................................................................................................ 20

C.    Projected Financial Information/Feasibility of the Plan. ...................................... 20

D.    Risk Factors of the Plan. ........................................................................................ 21

VI. CONCLUSION AND RECOMMENDATION ................................................................... 22

## <u>EXHIBITS</u>

A.      Liquidation Analysis

B.      Financial Forecasts for Years 2023-2028

<h1 style="text-align:center">DISCLOSURE STATEMENT</h1>

## I.    INTRODUCTION

### A.    Purpose of Disclosure Statement

Jeffrey D. Menoff and Lori L. Menoff (the "Debtors") hereby recommend and solicit acceptance of their proposed Plan of Reorganization (the "Plan"), by all persons entitled to vote. A copy of the Plan accompanies this document. The Debtors are distributing this Disclosure Statement (the "Disclosure Statement") and Plan to all of the known Creditors of the Debtors, pursuant to Section 1125 of the United States Bankruptcy Code (the "Bankruptcy Code" or "Code"). This Disclosure Statement is intended to provide Creditors with information of a kind, and in sufficient detail, that would enable a typical Creditor to make an informed vote to accept or reject the Plan. This Disclosure Statement has been approved by the Bankruptcy Court before its distribution. The Plan itself is a separate document which is being distributed herewith. The terms of the Plan are incorporated herein by reference.

Although every effort has been made to ensure the accuracy of this Disclosure Statement and the Plan, in the event of a conflict between the terms of this Disclosure Statement and the Plan, the terms of the Plan shall be controlling. Accordingly, Creditors should be sure to review thoroughly the terms of that document, as well as this document.

### B.    Definitions

Except as otherwise expressly stated in this Disclosure Statement, all capitalized terms used in this Disclosure Statement shall have the same meanings given to those terms in the Definitions set forth in Article I of the Plan. Accordingly, Creditors should also be sure to thoroughly review Article I of the Plan in connection with their review of both this Disclosure Statement and the Plan.

All terms used in the Plan and Disclosure Statement that are defined in the Code shall have the meanings set forth in the Code, unless otherwise defined by the Plan and/or Disclosure Statement. All statutory references shall be to the Code, unless otherwise indicated.

### C.    Sources of Information

Except as otherwise expressly indicated, the portions of the Disclosure Statement describing the Debtors, their debts and their property have been prepared from information provided by and/or prepared by the Debtors in consultation with their counsel and their accountants.

No representations concerning the Debtors, their assets, liabilities, or the post-reorganization operations of the Debtors inconsistent with anything contained herein have been authorized.

NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE PLAN OTHER THAN THOSE SET FORTH IN THIS DISCLOSURE STATEMENT. ANY

REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE OR REJECTION OF THE PLAN WHICH ARE OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE PLAN SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION, AND SUCH ADDITIONAL REPRESENTATIONS AND INDUCEMENTS SHOULD BE REPORTED TO COUNSEL FOR THE DEBTORS, WHO, IN TURN, SHALL DELIVER SUCH INFORMATION TO THE BANKRUPTCY COURT FOR SUCH ACTION AS MAY BE DEEMED APPROPRIATE.

THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT. FOR THE FOREGOING REASONS, AS WELL AS BECAUSE OF THE LARGE NUMBER OF FACTORS WHICH COULD AFFECT THE DEBTORS' FUTURE REVENUES AND EXPENSES, THE DEBTORS ARE UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACY, ALTHOUGH GREAT EFFORT HAS BEEN MADE BY THE DEBTORS TO ENSURE THAT ALL MATTERS SET FORTH HEREIN ARE ACCURATE.

     D.    <u>Filing of Reorganization Case</u>

On August 27, 2019, the Debtors filed a Petition for voluntary reorganization under Chapter 11 of the Code in the United States Bankruptcy Court for the Western District of New York, as Case Number 17-12189-CLB (the "Filing"). The Case is assigned to the Honorable Carl L. Bucki, Chief United States Bankruptcy Judge.

Upon the Filing of their Petition, the Debtors became Chapter 11 "Debtors-in-Possession" under the Code and have operated in such capacity since that time.

Pursuant to the applicable provisions of the Code, the law firm of Andreozzi Bluestein LLP ("Andreozzi Bluestein"), 9145 Main Street, Clarence, New York 14031, was appointed as general counsel for the Debtors. On June 1, 2023, Andreozzi Bluestein merged with Lippes Mathias LLP ("Lippes Mathias"). Also, pursuant to the applicable provisions of the Code, Bahgat & Laurito-Bahgat ("Bahgat") has been appointed as accountants for the Debtors. Additionally, in connection with the Debtors' previous sale of a horse farm which they owned as of the Filing of this case, the Debtors retained Holiday Valley Realty Co. Inc. ("Holiday Valley") as real estate broker for the Debtors and Lundberg Price, P.C. ("Lundberg Price") was appointed as special real estate counsel for the Debtors.

The Debtors have now filed with the United States Bankruptcy Court for the Western District of New York (the "Bankruptcy Court") their proposed Plan of Reorganization, whereby the Debtors set forth both those distributions which they propose to make to their Creditors and how the Debtors propose to comply with all applicable legal requirements for confirmation. As discussed more fully below, the Debtors' Plan proposes to deliver to Creditors payments of a value of at least as much as that which Creditors could expect to receive in a Chapter 7 liquidation of the Debtors' non-exempt assets. It is the Debtors' belief that it is in the best interests of all of their Creditors for the Debtors' Plan to be confirmed by the United States Bankruptcy Court. Accordingly, the Debtors request that those Creditors entitled to vote for the Plan do so at this time.

**THE DEBTORS RECOMMEND A VOTE FOR ACCEPTANCE OF THE PLAN.**

E.    Confirmation of Plan

　　　1.    Solicitation of Acceptances

　　　　　This Disclosure Statement has been approved by the Bankruptcy Court in accordance with Section 1125 of the Code and is being provided to each Creditor whose Claim has been scheduled by the Debtors or who has filed a Proof of Claim against the Debtors. The Disclosure Statement is intended to assist Creditors to evaluate the Plan and to determine whether to accept or reject the Plan. Under the Code, acceptance or rejection of the Plan may not be solicited unless a copy of this Disclosure Statement is furnished prior to or concurrently with such solicitation.

　　　2.    Manner of Voting on Plan

　　　　　Each entity entitled to vote on the Plan may cast its vote for or against the Plan by completing, dating and signing the Ballot for Accepting or Rejecting Plan (the "Ballot") accompanying this Disclosure Statement and the Plan and by filing it with the Bankruptcy Court. It is the practice of the United States Bankruptcy Court for the Western District of New York to request that Ballots either be filed electronically or sent directly to the Court for tabulation. If you or your attorney has an account, ballots may be filed electronically with the Bankruptcy Court's CM/ECF system, https://ecf.nywb.uscourts.gov. Alternatively, ballots may be cast either by personally delivering the Ballot or by mailing the Ballot to the following address:

> Clerk, United States Bankruptcy Court
> Western District of New York
> Robert H. Jackson United States Courthouse
> 2 Niagara Square
> Buffalo, New York 14202

　　　　　In order to be counted, all Ballots must be filed prior to the date established by order of the Bankruptcy Court as the date for the Confirmation Hearing, or prior to the time of any adjourned date or continuation of that hearing. A copy of the Bankruptcy Court Order establishing the date for the Confirmation Hearing either accompanies this Plan or is being sent to all Creditors under separate cover.

　　　3.    Persons Entitled to Vote on the Plan

　　　　　Only the votes of Classes of Creditors whose Claims are "impaired" by the Plan will be counted in connection with Confirmation of the Plan. Generally, and subject to the specific provisions of Section 1124 of the Code, this includes any Creditors whose legal rights are being modified by the Plan or who, under the Plan, will receive less than payment in full of their respective Claims. The treatment of Claims in Classes 1, 2, 3, 4, 5 and 6 will not be affected by the Plan and they are not impaired under the Plan. Classes 7, 8 and 9 are impaired and they will be entitled to vote on the Plan.

　　　　　In determining acceptance of the Plan, votes will be counted only if submitted by a Creditor who, prior to the Proof of Claim bar date established by the Court, has either timely filed with the Bankruptcy Court a Proof of Claim which has not been disallowed, disqualified or suspended prior to computation of the vote on the Plan, or whose Claim was

Case 1-19-11693-CLB,    Doc 319,    Filed 11/06/23,    Entered 11/06/23 11:59:15,
Description: Main Document , Page 8 of 27

scheduled by the Debtors as an undisputed Claim in their bankruptcy Schedules filed in this Case. By an Order entered herein on September 28, 2020, the Court established December 31, 2020 as the Claims Bar Date in this Case. Any Pre-Petition Claims which are filed after the Claims Bar Date shall be deemed untimely filed and disallowed (in the absence of an Order of the Court permitting such Claim to be filed late) and the holders of any such Claims which are neither timely filed nor Scheduled by the Debtors as undisputed are not eligible to vote on the Plan.

4.    Hearing on Confirmation of Plan

The Bankruptcy Court will hold a hearing to determine whether the Plan has been accepted by the requisite number of Creditors and whether the other requirements for Confirmation of the Plan have been satisfied. Each Creditor will receive, either with this Disclosure Statement and Plan or separately, the Bankruptcy Court's Notice of Hearing on Confirmation of the Plan.

5.    Acceptances Necessary to Confirm Plan

To confirm the Plan, the Court, at the hearing on Confirmation, must find that it and its proponents comply with the provisions of Code Section 1129.

At the Confirmation Hearing, the Bankruptcy Court must determine, among other things, whether the Plan has been accepted by at least one Class of Creditors whose Claims are impaired by the Plan. Under Section 1126 of the Code, an impaired Class is deemed to have accepted the Plan if (i) at least two-thirds in amount and (ii) more than one-half in number of the Allowed Claims of Class members who have voted on the Plan have voted to accept it. Furthermore, unless there is acceptance of the Plan by an impaired Class, the Bankruptcy Court must also determine that under the Plan, Class members will receive property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Class members would receive or retain if the Debtors were liquidated under Chapter 7 of the Code.

Chapter 11 of the Code permits the adjustment of Secured Claims and Unsecured Claims. A Chapter 11 Plan may provide less than full satisfaction of senior indebtedness and payment of junior indebtedness or may provide for retention of equity interests absent full satisfaction of indebtedness if no impaired Class with a higher payment priority votes against the Plan.

6.    Cramdown: Confirmation Without Acceptance by All Impaired Classes

In the event that any impaired Class of Claims does not accept the Plan, the Bankruptcy Court may still confirm the Plan, at the request of the Debtors if, as to each impaired Class which has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to that Class. A Plan of Reorganization "does not discriminate unfairly" within the meaning of the Bankruptcy Code, if no Class receives more than it is legally entitled to receive for its Claims or equity interests.

"Fair and equitable" has different meanings with respect to the treatment of Secured Claims and Unsecured Claims. As set forth in Section 1129(b)(2) of the Code, in pertinent part, those meanings are as follows:

(A)     With respect to a class of secured claims, the plan provides -
--

(i)(I)     that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II)     that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii)     for the sale, subject to section 363(k) of this title [the Code], of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) and (iii) of this subparagraph; or

(iii)     for the realization by such holders of the "indubitable equivalent" of such claims.

(B)     With respect to class of unsecured claims, the plan provides:

(i)     that each holder of a claim of such class receive or retain, on account of such claim, property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii)     the holder of any claim or interest that is junior to the claims of such class will not receive or retain any property under the plan on account of such junior claim or interest.

The Debtors submit their proposed Plan which accompanies this Disclosure Statement should be approved by Creditors and should be Confirmed by the Court, without need for the cramdown of any Class, because it provides Creditors with as much or more than they would likely receive in any liquidation of the Debtors.

Should any Class of Secured Claims not vote in favor of the Plan, the Debtors reserve their right to seek to "cram down" any such dissenting Class, pursuant to 11 U.S.C. §1129(b)(2).

## II.     THE EVENTS LEADING UP TO THE FILING OF THIS CASE AND THE DEBTORS' POST-PETITION REORGANIZATION EFFORTS

A.     Pre-Petition Events.

Debtor Jeffrey Menoff is a licensed dentist who provides dental services through his business, Jeffrey D. Menoff, DDS, P.C., which is located in Jamestown, New York.  Dr. Menoff's practice largely focuses on dental extractions and removable prosthetics serving a rural

population. Dr. Menoff's practice does not perform dental implants, which helps to reduce the costs to his patients for services.

Debtor Lori Menoff is licensed as a Registered Professional Nurse. Additionally, she is also the office manager at her husband's dental practice. At the time this case was filed, Mrs. Menoff was also the principal manager of the Debtors' other business, Menoff Family, Inc., d/b/a Nash Hill Equestrian Center, which operated the Debtors' horse farm and arena in Persia, New York, until it was sold in July, 2020. Neither of the Debtors' corporations has filed for bankruptcy.

Dr. Menoff received a Bachelor Degree in anatomy and physiology at Cornell University and a Master of Science Degree at the North Carolina State University. He is a graduate of the University at Buffalo School of Dental Medicine. He completed a hospital based residency at the Buffalo General Hospital and remained on the staff in a supervisory capacity for several years. He served as the Director of Dentistry at the Tri-County Memorial Hospital Dental Clinic. In the past, Dr. Menoff was recognized as the Rural Health Provider Of the Year at the 25th Annual National Conference of the National Rural Health Association.

Debtor Jeffrey Menoff has been operating his dental practice since approximately 1985, first as a d/b/a and then, since January 1, 2016, as a professional corporation. With the exception of the Panoramic X-Ray Machine purchased in 2019 and some computers purchased in 2020, substantially all equipment and furnishings used in the dental practice are more than ten years old. Because the corporation has elected to be treated as an "S" corporation, all corporate net profits flow through to Dr. Menoff as income.

Jeffrey Menoff is currently 67 years old and Lori Menoff is currently 64 years old. They live in their long-time family home in Gowanda, New York along with their 22 year-old son.

In 2005, the Debtors formed a corporation, Menoff Family, Inc., to construct and to operate a 42 stall horse barn and arena, located at 10999 Persia Road, Town of Persia, New York, and 44.91 acres of adjacent land (the "Arena"), which offered horse boarding, training and lessons. Unfortunately, despite the quality of the facility and its operations, the revenues of that business were not sufficient to pay all costs for its operations. As a result, the Debtors each had to devote funds earned through their other jobs to help to cover the expenses from the Arena. Because of this, the Debtors did not have the funds that were needed for them to remain current on their required estimated tax payments to both the Internal Revenue Service (the "IRS") and to the New York State Department of Taxation and Finance ("NYS Tax"), as well as other expenses in excess of what they could afford to timely pay. This bad situation was compounded by the Debtors' failure to timely file their tax returns for several years.

The Debtors worked with Bahgat and Andreozzi Bluestein to both catch up on their delinquent tax returns and to increase their tax withholdings through wage deductions. The Debtors and their representatives negotiated several different payment arrangements with the IRS and NYS Tax prior to the Filing, however, the Debtors had recurring difficulties remaining current on those payment obligations. During the month of August, 2019, the IRS served levies on the Debtors' bank accounts and served wage levies on the Debtors' wages from the dental practice.

After consulting with Andreozzi Bluestein, the Debtors determined that filing a Chapter 11 bankruptcy would permit them far greater opportunities to restructure their payments to the IRS, to NYS Tax and to other creditors than would be available to them outside of bankruptcy. Additionally, filing for bankruptcy would allow the Debtors the opportunity to reorganize their finances and to sell the Arena as a going concern so that running that business would no longer be a drain on the Debtors' finances. On August 27, 2019, the Debtors commenced this case though the filing of a voluntary joint individual Chapter 11 bankruptcy Petition.

B.    Post-Petition Reorganization Efforts.

Initially, as of the Filing, the Debtors obtained authorization to use cash collateral subject to liens of their principal secured creditors, the IRS and NYS Tax. The Debtors are currently making adequate protection payments to the IRS and to NYS Tax in accordance with the Court's cash collateral orders, which provide for fixed level payments, but which also provide for the Debtors to make additional lump sum payments, as funds are available, which the Debtors have done. As is discussed in further detail below, the net proceeds from the sale of the Debtors' horse farm and Arena were also paid to the IRS.

On August 28, 2019, the Debtors filed a motion seeking authorization to open Debtor-in-Possession bank accounts at Community Bank. That motion was granted by an Order entered on September 16, 2019.

In October, 2019, Ford Motor Credit Company ("Ford") filed two motions for relief from the automatic stay relating to two of the Debtors' vehicles, even though the Debtors were timely in making both pre-petition and post-petition payments. Ultimately, the Debtors entered into two Stipulations with Ford, one to assume the lease for the Debtors' 2017 Ford F150 and one to provide for adequate protection to Ford for the Debtors' 2018 Ford F150.

On December 13, 2019, the Debtors filed a motion seeking authorization for Debtor Jeffrey D. Menoff to assume his non-residential real property lease for his dental practice. That motion was granted by an Order entered on December 23, 2019.

On or about May 12, 2019, several months prior to the Filing, the Debtors had entered into a listing agreement for the sale of their horse barn, arena and related real estate and equipment with Holiday Valley. After the Filing, this Court authorized the Debtors to employ Holiday Valley as their real estate broker by an Order entered on October 10, 2019. The Debtors were also authorized to employ Lundberg Price as their special real estate counsel in connection with the sale of the Arena by an Order entered on June 29, 2020.

Prior to the Filing, Holiday Valley and the Debtors initially listed the Arena for sale for $799,900.00. Shortly after the Filing, the Debtors received an offer for the Arena for the asking price of $799,900.00. That proposed purchaser, however, ultimately was not able to make those financial arrangements needed to enable it to close that proposed purchase.

In April, 2020, the Debtors received a new purchase offer and on June 25, 2020, the Debtors filed a motion seeking authorization to sell the Arena, as well as substantially all equipment used by Menoff Family, Inc. in the operation of the Arena, to Staci H. Saulter and

Randy E. Kubasiak for $600,000.00. That motion was granted by an Order entered on July 17, 2020 and that sale closed on July 21, 2020.

After payment of closing costs, the Debtors' special real estate counsel, Lundberg Price, paid $37,013.86 toward real estate taxes and $156,360.87 to Community Bank, N.A. ("Community Bank") to fully satisfy its mortgage claim. Lundberg Price then disbursed the net sale proceeds of $337,259.60 to the IRS to partially pay its secured claim.

In July, 2020, after the Debtors filed their motion seeking authorization to sell the Arena, but prior to the date of the sale hearing, Community Bank, which at that time held a mortgage secured by both the Arena and the Debtors' residence, filed a motion seeking relief from the automatic stay for mortgage arrears. After the stay relief motion was filed, counsel for the Debtors advised counsel for Community Bank regarding the imminent sale of the Arena and the anticipated payoff of Community Bank's mortgage. After the sale order was entered, counsel for the Debtors further advised counsel for Community Bank that the sale had closed and that funds were being sent to Community Bank to pay the mortgage in full. Despite this knowledge, Community Bank did not withdraw its stay relief motion and on the same day an order granting its stay relief motion was entered, Community Bank offset against the Debtors' bank accounts, which was not something discussed in its stay relief motion or authorized by this Court's order. After further communications with counsel for Community Bank, this offset was reversed.

On September 4, 2020, the Debtors filed a motion seeking to establish a pre-petition claims bar date. Through an Order dated September 28, 2020, this Court established December 31, 2020 as the date by which all pre-petition claims had to be filed.

As was reported to the Court previously in connection with the Debtors' requests for authorization to use cash collateral, on or about March 16, 2020, in an effort to mitigate the potential spread of the COVID-19 virus, it was recommended by the American Dental Association ("ADA") that all dentists nationwide immediately begin to perform only emergency dental procedures.

Following the recommendations of the ADA, during the period of March 16, 2020 through May 31, 2020, Debtor Jeffrey Menoff's dental practice was only able to perform emergency dental procedures, which materially affected the revenues his practice was able to generate.

As of June 1, 2020, the ADA, the Centers for Disease Control and Prevention ("CDC") and the State of New York issued updated guidelines permitting dentists to resume providing non-emergency dental services to their patients. These rules initially only permitted Dr. Menoff's office to operate with no more than 50 percent of its staff and only to treat 50 percent as many patients as had been booked each day prior to the pandemic.

Those strict numerical guidelines were ultimately replaced by more detailed protocols regarding required social distancing and personal protective equipment and rules regarding required delays before cleaning and disinfecting patient care areas. Complying with these requirements has continued to limit the number of patients able to be seen below pre-pandemic levels, although the office staff has become more proficient in meeting these

requirements over time and the dental practice's revenues have begun to approach pre-pandemic levels.

Due to the steady increase in Dr. Menoff's dental practice revenues and the fact that the Debtors are no longer funding the operations of the Arena, the Debtors are now operating at a positive cash flow.

The Debtors believe that, based upon their current wages from employment and business revenues Dr. Menoff's dental practice, they can now propose a feasible Plan which will make a significant repayment to their unsecured creditors.

## III.   SUMMARY OF THE PLAN

A.   Overview.

The Debtors are at this time proposing a Plan of Reorganization which details the amounts of payments and the manner in which the Debtors propose to make payments and distributions to their Creditors.

The Debtors believe that their present financial situation does not permit them to propose a Plan which provides for payment in full to be made to all of their Creditors. However, as detailed more fully below, in accordance with the provisions of the Code, the Debtors are proposing a Plan which they believe will pay all of their Creditors more than they would have received, under Chapter 7 of the Code. *See*, Exhibit A, Chapter 7 Liquidation Analysis of the Debtors.

B.   Administrative Expense Claims.

In accordance with the requirements of the Code, all fees and expenses incurred by the Debtors on or since the date of the Filing must be paid in full. In accordance with Code Section 1123(a)(1), such Claims, known as "Administrative Expenses," are not classified by the Plan into Classes and are not eligible to vote on the Plan. Section 1123 also provides that Pre-Petition Priority Unsecured Tax Claims are not to be classified into Classes and, thus, do not vote on the Plan.

The Plan provides that all fees of those professionals employed by the Debtors in connection with this Case, including the fees of their general counsel, Lippes Mathias, successor by merger to Andreozzi Bluestein, and their accountants, Bahgat, shall be paid in full. The Plan provides that these Claims shall be paid by the Debtors either on the Effective Date or over time, as agreed with the Claimant. Exhibit B to this Disclosure Statement, the Debtors' Financial Forecasts for 2023-2028, set forth the Debtors' planned payments proposed to be made to Lippes Mathias and Bahgat, over time.

Upon information and belief, all Post-Petition fees of the Debtors' prior real estate broker, Holiday Valley, and its real estate counsel, Lundberg Price, have been paid in full.

All Post-Petition tax obligations of the Debtors are believed to be current. To the extent that this understanding is incorrect, any such obligation will be paid as an Administrative Expense Claim, either upon the Effective Date of the Plan or when due, if later.

C.    Unsecured Priority Claims.

No Pre-Petition priority expense claims have been included by the Debtors in their bankruptcy Schedules or filed by any Creditors. As is discussed in the Debtors' Plan and in Class 8 below, however, the Debtors submit that what were filed by NYS Tax as fully secured claims for income taxes are, in fact, wholly unsecured, a portion of which will be classified and paid only as priority general unsecured claims, as discussed more fully in the Debtors' Plan in Class 8. In the event that NYS Tax does not consent to this treatment, the Debtors will file a motion seeking a determination that the claims of NYS Tax should be found to be wholly unsecured claims.

D.    Treatment of Pre-Petition Claims and Interests.

The Plan provides for the Classification of Pre-Petition Claims of Creditors and their treatment as follows:

1.    Class 1:  Secured Claim of Community Bank, N.A. for Mortgage on Debtors' Residence and Arena.

This Class consists of the Claim of Community Bank, which was secured as of the Filing by a mortgage on the Debtors' residence located at 8925 Nash Hill Road, Gowanda, New York 14070 and on the Debtors' Arena. Pursuant to Proof of Claim No. 7 filed by Community Bank on or about September 20, 2019, as of the Filing, the Debtors were obligated to Community Bank for this secured mortgage claim in the amount of $168,384.29.

This Claim is unimpaired. As discussed above in this Disclosure Statement, Community Bank's mortgage claim was paid in full from the sale of the Arena in July, 2020. For that reason, no payments will be made to Community Bank on this Claim under the Plan.

2.    Class 2:  Secured Real Property Tax Claim of Town of Persia on Debtors' Residence and Arena.

This Class consists of the Debtors' secured pre-petition obligation for real property taxes on the Debtors' residence and Arena. Upon information and belief, as of the Filing, the Debtors were obligated to the Town of Persia for pre-petition real property taxes on that combined parcel in the approximate amount of $26,563.03.

This Claim is unimpaired. As discussed above in this Disclosure Statement, the Town of Persia's Pre-Petition secured real property tax claim was paid in full from the sale of the Arena in July, 2020. For that reason, no payments will be made to the Town of Persia on this Pre-Petition Claim under the Plan. Post-Petition real property tax administrative expenses will be paid by the Debtors in the ordinary course as they come due.

3.    Class 3:  Secured Claim of Ford Motor Credit Company for 2015 Ford F350.

This Class consists of the Secured Claim of Ford, which Claim was secured by a 2015 Ford F350 owned by Debtor Lori Menoff and the Debtors' son, Matthew Menoff. Pursuant to Proof of Claim No. 13 filed by Ford on or about October 2, 2019, as of the Filing,

Debtor Lori Menoff and Matthew Menoff were obligated to Ford for this vehicle loan in the amount of $9,905.09.

This Claim is unimpaired. This vehicle was sold by Matthew Menoff and the loan was paid off in full while this case has been pending. For that reason, no payments will be made to Ford on this Claim under the Plan.

4.    Class 4:  Secured Claim of Ford Motor Credit Company for 2018 Ford F150.

This Class consists of the Secured Claim of Ford, which Claim is secured by a 2018 Ford F150 owned by Debtor Jeffrey Menoff. Pursuant to Proof of Claim No. 14 filed by Ford on or about October 2, 2019, as of the Filing, Debtor Jeffrey Menoff was obligated to Ford for this vehicle loan in the amount of $46,252.75. Upon information and belief, the current balance due on this vehicle loan is approximately $8,340.25.

This Claim is unimpaired. Debtor Jeffrey Menoff's dental practice will continue to make monthly payments to Ford in the amount of $758.25 per month, which includes interest at the contract rate of 0.0% per annum, until Ford's Secured Claim is paid in full, which is expected to occur in September, 2024. If at any time the dental practice is unable to make these payments to Ford, the Debtors will make the required monthly payments to Ford until Ford's Secured Claim is paid in full.

Ford will retain its existing liens and security interests on its collateral until its Secured Claim is paid in full.

5.    Class 5:  Secured Claim of Manufacturers and Traders Trust Company for 2015 Ford Focus.

This Class consists of the Secured Claim of Manufacturers and Traders Trust Company ("M&T"), which Claim is secured by a 2015 Ford Focus owned by Debtor Lori Menoff and the Debtors' daughter, Angel Menoff. Upon information and belief, as of the Filing, Debtor Lori Menoff and Angel Menoff were obligated to M&T for this vehicle loan in the approximate amount of $13,438.60.

This Claim is unimpaired. This vehicle loan was paid off in full while this case has been pending. For that reason, no payments will be made to M&T on this Claim under the Plan.

6.    Class 6:  Secured Claim of Patterson Companies for Promax Panoramic X-Ray Machine.

This Class consists of the Secured Claim of Patterson Companies ("Patterson"), which Claim is secured by a Promax panoramic x-ray machine owned by Debtor Jeffrey Menoff and used by his dental practice. Pursuant to Proof of Claim No. 16 filed by Patterson on or about November 25, 2019, as of the Filing, Debtor Jeffrey Menoff was obligated to Patterson for this equipment loan in the amount of $28,104.41. Upon information and belief, the current balance due on this equipment loan is approximately $2,345.52.

This Claim is unimpaired. Debtor Jeffrey Menoff's dental practice will continue to make monthly payments to Patterson in the amount of $635.73 per month, which includes interest at the contract rate of 5.95% per annum, until Patterson's Secured Claim is paid in full, which is expected to occur in February, 2024. If at any time the dental practice is unable to make these payments to Patterson, the Debtors will make the required monthly payments to Patterson until Patterson's Secured Claim is paid in full.

Patterson will retain its existing liens and security interests on its collateral until its Secured Claim is paid in full.

7. <u>Class 7: Secured Claims of Internal Revenue Service</u>.

This Class consists of the Secured Claims of the IRS for income taxes. On February 24, 2022, after communications with counsel for the Debtors stating the Debtors' position that the original claim filed in this case by the IRS on September 19, 2019 was less than fully secured, the IRS filed an Amended Proof of Claim in this case reducing its secured claims from a total of $1,504,333.23 to $1,223,953.04 and reclassifying an additional $280,380.19 of its claims as only being payable as general unsecured claims. The Debtors do not dispute the amount of or the classification of this claim, as amended.

The Debtors have been making post-bankruptcy adequate protection payments to the IRS since shortly after the Filing of this case. It is estimated that these payments, which have included both monthly adequate protection payments and additional payments when the Debtors' cashflow has allowed them to do so, will total approximately $466,000.00 as of December 31, 2023. Additionally, the IRS received a lump sum payment in the amount of $357,015.06 representing the net proceeds from the sale of the Arena. Upon information and belief, as of December 31, 2023, the IRS's Secured Claim will have been paid down by a total of approximately $818,015.06 and the balance due at that time will total approximately $400,938.04.

Post-Petition, the Debtors timely filed and timely amended their 2020 IRS Form 1040. Because the Debtors' 2020 sale of their horse barn and farm caused the Debtors to incur a significant long-term capital loss, the Debtors are at this time entitled to receive from the IRS a 2020 income tax refund in the amount of $47,001.00, plus statutory interest. The IRS has been holding this refund and previously requested that the Debtors' counsel consent to this Post-Petition refund being applied to the Debtors' Pre-Petition tax liabilities. Because there is no statutory right for a creditor to offset a Post-Petition refund against a Pre-Petition debt, the Debtors have not previously taken a position on this request.

This Claim is impaired. The Debtors will continue making monthly adequate protection payments to the IRS at the rate of $5,000.00 per month until the Debtors' Plan is confirmed, which it is estimated will occur in January, 2024. The Debtors shall pay the IRS's Secured Claims in full, with interest at the IRS rate in effect as of the Confirmation Date, currently at the rate of 8% per annum. From Confirmation of the Debtors' Plan, which is estimated to occur in January, 2024, through August, 2024, the Debtors will make monthly payments of $5,000.00, beginning on the 20th day of the month following Confirmation. Thereafter, beginning in September, 2024, after the Debtor's priority tax payments to NYS Tax are completed, the Debtors will begin making 45 payments to the IRS at the increased rate of $10,000.00 per month, until the

IRS's Secured Claims are paid in full. It is estimated that this Secured Claim will be fully paid in June, 2028, approximately 51 months after Confirmation of the Debtors' Plan.

Because the Debtors' proposed payments to the IRS will extend beyond 60 months after the Filing of this case, the consent of the IRS to the confirmation of the Debtors' Plan is contingent upon the payment terms provided by the Plan being acceptable to the IRS. The Debtors and the IRS have communicated regarding the Debtors' Plan proposal, however, the IRS has not expressly taken any position regarding these proposed payment terms.

As a part of their proposal to the IRS, the Debtors are also proposing that the $47,001.00 amount of their 2020 Federal income tax refund, plus interest, be applied as an estimated tax payment towards the Debtors' 2023 and/or 2024 Federal income taxes.

The IRS will retain its existing Pre-Petition and Post-Petition liens on assets of the Debtors until its Secured Claims are paid in full, at which time the IRS will release its liens.

8.   Class 8:  Disputed Secured Claims of New York State Department of Taxation and Finance.

This Class consists of the disputed Secured Claims of NYS Tax for income taxes. On August 28, 2019, NYS Tax filed a Proof of Claim in this case asserting a secured claim in the amount of $175,709.97. The Debtors do not dispute the amount of this claim, however, the Debtors assert that these claims are wholly unsecured because all equity in the Debtors' assets is subject to liens and security interests which have priority over the claims of NYS Tax. Instead, the Debtors submit that the NYS Tax claims for tax principal, in the combined total amount of $74,698.67, and interest, in the combined total amount of $48,657.90, should be classified as priority tax claims totaling $123,356.57. Tax penalty claims, in the combined total amount of $52,353.40 should be reclassified as general unsecured claims.

The Debtors have been making post-petition adequate protection payments to NYS Tax since shortly after the Filing of this case and it is estimated that as of December 31, 2023, the Debtors will have paid adequate protection payments totaling approximately $113,000.00, which would be a credit against the NYS Tax priority tax claims. Accordingly, NYS Tax's priority unsecured tax claim as of December 31, 2023 is estimated to total approximately $10,356.57.

This Claim is impaired. Because the tax claims of NYS Tax are wholly unsecured, no distributions will be made to NYS Tax on account of any of its claims as a secured claim and its penalty claims will be treated solely as general unsecured claims. The Debtors began making adequate protection payments to NYS Tax in January, 2023 at the rate of $1,500.00 per month. Consistent with the requirements of 11 U.S.C. §1129(a)(9)(C), after Confirmation, estimated to occur in January, 2024, the Debtors shall pay NYS Tax's priority unsecured tax claims in full, with interest at the rate of 10.5% per annum, through monthly payments of $1,500.00, estimated to begin on the 20th day of February, 2024, until NYS Tax's Pre-Petition priority unsecured tax claims are paid in full. It is estimated that that priority unsecured claim will be fully paid in August, 2024, within 60 months of the Filing of this case.

The general unsecured penalty claims of NYS Tax will be paid only as provided in Class 9 below.

Because all of the claims of NYS Tax are wholly unsecured, NYS Tax will release its liens upon Confirmation of the Debtors' Plan.

9. Class 9: Unsecured Claims.

This Class consists of all Unsecured Pre-Petition Claims against the Debtors not otherwise provided for by the Plan, including credit card debt, all unsecured tax penalties, any lease rejection damages claims and all other Claims not specifically addressed elsewhere in the Plan.

The Debtors' Schedule E/F identified Jeffrey Menoff's mother, Regina Menoff, as holding a claim in the amount of $15,002.30 for a pre-petition loan which she had made to Dr. Menoff for use in his dental practice. Regina Menoff passed away after the Filing and while this Chapter 11 case has been pending, the executrix of his mother's estate reduced Jeffrey Menoff's distribution from his mother's estate by an amount equal to the loan balance then due. Accordingly, no payment will be made to the Estate of Regina Menoff by the Debtors.

As Scheduled by the Debtors or as stated in filed Proofs of Claim, Claims in this Class, excluding the claim of Regina Menoff, totaled approximately $440,243.18. As stated above, the $52,353.40 in NYS Tax penalty claims will be reclassified as general unsecured claims and included in this Class, such that general unsecured claims will total approximately $492,596.58.

The Claims of Class 9 Claimants are impaired under the Plan. The Plan contemplates that a total of $50,050.00 will be distributed to such claimants over a period of 48 months, *pro rata*. No Pre-Petition interest will be paid on such payments over the life of the Plan. The Debtors estimate that this will represent a distribution to unsecured creditors of the Debtors of slightly more than 10% of their claims.

After Confirmation, beginning in February, 2024, the Debtors will begin to deposit into a new bankruptcy distribution checking account the sum of $750.00 per month. Beginning in February, 2027, the Debtors will increase their monthly deposits to $850.00. The Debtors will make a deposit in the amount of $5,000.00 in July, 2028 and will make a final deposit in the amount of $3,600.00 in August, 2028. As provided below, periodic *pro rata* payments will be made to the holders of undisputed liquidated claims using these deposited funds.

A first dividend of approximately $4,620.00 will be paid, *pro rata*, to holders of undisputed liquidated claims approximately six months after Confirmation, intended to be made on or about August 15, 2024. Initial distributions to any holders of contingent, unliquidated or disputed claims will be deferred until such time as a Final Order is entered determining the allowed amount of such claims. Thereafter, approximately every six months, on or about the dates listed below, the Debtors will make *pro rata* distributions to allowed general unsecured creditors as provided below:

| Payment Year | Amount [$] to be Distributed *Pro Rata*, to Allowed Claimants |
|---|---|
| 2024 (On or about August 15) | $4,620.00 |
| 2025 (On or about February 15) | $4,620.00 |
| 2025 (On or about August 15) | $4,620.00 |
| 2026 (On or about February 15) | $4,620.00 |
| 2026 (On or about August 15) | $4,620.00 |
| 2027 (On or about February 15) | $4,620.00 |
| 2027 (On or about August 15) | $4,620.00 |
| 2028 (On or about February 15) | $4,620.00 |
| 2028 (On or about August 15) | $13,090.00 |
| **TOTAL:** | **$50,050.00** |

After the time that payments pursuant to the terms of the Debtors' Plan are completed, as provided in the Debtors' Plan, upon Confirmation of the Debtors' Plan, all creditors will be stayed from any effort to pursue any collection actions against the Debtors without Court authorization. The remaining balance due to holders of all general unsecured claims will be discharged when the Debtors receive their bankruptcy discharge.

The Debtors reserve the right to object to any Class 9 Claim, in which case Distributions to such creditors shall be made only upon a Final Determination of such Claims.

E.    Disputed Claims and Avoidable Transfers.

The Debtors shall retain the power to object to Claims and to exercise their Chapter 5 Powers as authorized by the Code. Objections to Claims shall be filed by the Debtors with the Court and served by the Debtors upon the holder of each Claim to which objection is made within 120 days after the Effective Date of this Plan.

Upon information and belief, the Debtors made no potentially avoidable pre-petition transfers and no proceedings to avoid any such transfers are planned. Any proceedings to avoid transfers pursuant to the Debtors' powers under Chapter 5 of the Code are required to be commenced within the applicable statutes of limitations. Upon information and belief, any applicable statutes of limitations for bringing any suit to set aside any potentially avoidable transfers has already expired. Any proceeds from the prosecution by the Debtors of any action to avoid a transfer under their Chapter 5 Powers would be the property of the Debtors and would be used by the Debtors to fund Plan Distributions or otherwise in the course of their business.

F.        Assumption and Rejection of Leases and Executory Contracts.

As reflected on the Debtors' Schedule G, as of the Filing, the Debtors had two unexpired leases.

The Debtors assumed a lease with Ford in the names of Jeffrey Menoff and the Debtors' son, Andrew Menoff, for a 2017 Ford 150 through a Stipulation filed with this Court on December 10, 2019 (Docket Entry No. 66).

This Court authorized Debtor Jeffrey Menoff to assume the lease for his dental office through an Order dated December 23, 2019 (Docket Entry No. 79).

Upon information and belief, the Debtors were not parties to any other pre-petition executory contracts or unexpired leases as of the Filing. Upon Confirmation, the Debtors will be deemed to have rejected any other pre-petition executory contracts or unexpired leases which might have existed. The Confirmation Order shall constitute an Order of the Bankruptcy Court approving the Debtors' rejection of any pre-petition lease or executory contract as of the Confirmation Date, pursuant to Section 365 of the Code. Rejections of an executory contract or lease shall be deemed to also constitute a rejection of all amendments or modifications thereto and all rights appurtenant thereto.

G.        Sources of Distributions and Funding of Future Operations Under the Plan.

The payment of Distributions to Creditors pursuant to the Plan will be accomplished through earnings from the Debtors' future business earnings and employment income and social security payments to Jeffrey Menoff. Attached as Exhibit B are forecasts of the Debtors' projected cash flow for the years 2023 through 2028.

H.        Method of Making Distributions Under the Plan.

1.        Cash Distributions.

The Debtors shall make Distributions in accordance with the priorities established by the Code and the terms of the Plan. Plan Distributions shall be made in accordance with the terms of the Plan. Furthermore, notwithstanding any other section of the Plan, the Debtors will make no distribution to any Claimant listed on the Debtors' bankruptcy Schedules as being contingent, unliquidated or disputed, unless said Claimant has filed a timely Proof of Claim herein and unless the Debtors do not object to any such Proof of Claim within 120 days after the Effective Date of the Plan.

Payments by the Debtors shall be by checks to be cashed within sixty (60) days of their issuance. The proceeds of any check not cashed within sixty (60) days of issuance shall revert to the Debtors. In the event that any payments to creditors are returned as being undeliverable, the Debtors will use their best efforts to locate an updated address for that creditor and may re-issue any previously returned payment. The Debtors will include with each distribution a note indicating that this is a Plan payment pursuant to the Debtors' Chapter 11 Plan and reminding each creditor that they must notify the Court and the Debtors of any future address change. In the event the Claimant to whom an uncashed check was issued does not notify the Debtors or the Court of their new address before all Class 9 distributions are completed, the Claimant shall be conclusively deemed to have waived any Claim to said proceeds by reason of its inaction. Any Claimant to whom a check is sent, which check is returned after being sent to the last known mailing address, as on file with the Court, shall be deemed to have waived its right to share in said Distribution, and in any subsequent Distribution, by failing to notify the Court and the Debtors of its change of address, unless they notify the Court and the Debtors of their new address before all Class 9 distributions are completed.

The Plan further provides that in the cases of any Claimant to whom a check is sent, which check is returned to the Debtors after being sent to the most recent mailing address, as on file with the Court, the Debtors shall have no obligation to make future distributions to said Claimant, unless the Claimant notifies the Debtors and the Court of a new mailing address, before the time that Distributions under the Plan are completed.

The Debtors need not pay to any Claimant any dividend in an amount less than $10.00 and the Plan provides that any such dividend is forgiven.

I.      Effects of Confirmation.

1.      Vesting of Assets.

Subject to the provisions of this Plan, the property of the estate of the Debtors shall vest in the Debtors on the Effective Date. As of the Effective Date, all such property of the Debtors shall be free and clear of all liens, Claims and Interests of holders thereof, except as otherwise provided herein. From and after the Effective Date, the Debtors will be authorized to use, acquire and dispose of their property free of any restrictions of the Bankruptcy Code, except as otherwise provided in the Plan.

2.      Confirmation Injunction/Permanent Injunction.

Except as provided in the Plan or the Confirmation Order, as of the Effective Date, all entities that have held, currently hold or may hold a Claim that is to be paid or discharged under this Plan are enjoined (the "Confirmation Injunction") from taking any of the following actions on account of any such Claims or rights: (a) commencing or continuing in any manner any action or other proceeding against the Debtors, or their property; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or other against the Debtors or their property; (c) creating, perfecting or enforcing any lien or encumbrance against the Debtors or their property; (d) asserting a setoff, right of subrogation recoupment of any kind against any debt, liability or obligation due to the Debtors or their property; and (e) commencing or continuing any action, in any manner, in any place, that does not comply with or is inconsistent with the

provisions of the Plan. Upon the issuance of the Debtors' discharge, this Confirmation Injunction shall become a permanent injunction. If the Court were for some reason to deny discharges to the Debtors, the Confirmation Injunction would not become a permanent injunction and all liabilities of the Debtors would remain due, with the Debtors receiving credit for all payments previously made.

3. <u>Post-Confirmation Matters</u>.

As provided elsewhere in the Plan, the Debtors shall begin making Distributions to their Creditors in accordance with the terms of the Plan upon the Effective Date of the Plan. Upon the Substantial Consummation of the Plan, the Debtors will file a Final Report and a motion for entry of a Final Decree. Upon the entry of a Final Decree in this Case, the Case will be closed. The Debtors will thereafter continue to make Distributions to their Creditors in accordance with the terms of the Plan until those Creditors are either paid in full or otherwise receive all of those Distributions which are provided for pursuant to the Plan. As set forth in the preceding paragraph, all entities which hold Claims against the Debtors which arose prior to the Filing and/or which are to be paid and/or discharged pursuant to the Plan shall be enjoined from taking any actions to collect or otherwise enforce those Claims against the Debtors or their property while the Debtors are making their confirmed Chapter 11 Plan payments, absent the reopening of the Case and the entry of an Order of the Court authorizing such entity to take any such actions. Upon the Debtors' completion of all Distributions provided for by the Plan, without the need for the payment of a Case reopening fee, the Debtors shall be permitted to file: (1) an application to reopen this Case for the sole purpose of issuing a discharge to the Debtors and (2) a certification by the Debtors that all required Distributions have been made in accordance with the confirmed Chapter 11 Plan. Notice of the application shall be served upon all creditors and the Office of the United States Trustee. At that time, any creditor may object to the Debtors receiving their discharges, if they believe that cause exists for their discharges to be denied. After the Debtors' discharge is issued or otherwise addressed by the Court, the Clerk of the Court will be authorized to re-close this case.

4. <u>Discharge of Debtors</u>.

As discussed more fully in the preceding paragraph, upon the start of distributions to creditors and the substantial Consummation of the Plan, the Debtors will file a Final Report and a motion for the entry of a Final Decree. Upon the entry of the Final Decree the case will be closed and the Debtors shall make those distributions to creditors as provided by the Plan. Upon the Debtors' completion of all Plan Distributions to Class 9 General Unsecured Creditors provided for by the Plan, the Debtors may request that the Court reopen this case for the purpose of issuing discharges to the Debtors. Except as provided in the Plan or the Confirmation Order, the rights afforded under the Plan and the treatment of Claims under the Plan shall be in exchange for and in complete satisfaction, discharge and release of all Claims, including any interest accrued on Claims from the Filing. Except as provided in the Plan or the Confirmation Order, the issuance of the Debtors' discharges shall discharge the Debtors from all Claims or other debts that arose before the Confirmation Date, and all debts of the kind specified in Section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not: (i) a Proof of Claim based on such debt is filed or deemed filed pursuant to Section 501 of the Code, (ii) a Claim based on such debt is allowed pursuant to Section 502 of the Code or (iii) the holder of a Claim based on such debt has

accepted the Plan. If the Court issues discharges to the Debtors, the Confirmation Injunction provided for in Subparagraph III.I.2 above shall become a permanent injunction.

## IV. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A. General.

The Plan will have tax consequences to the Debtors and to holders of Claims. A summary description of certain federal income tax consequences of the Plan of the Debtors is provided below. The description of tax consequences below is provided for informational purposes only and is subject to significant uncertainties. No opinion of counsel has been sought or obtained with respect to any tax consequences of the Plan and no tax opinion is given by this Disclosure Statement. No rulings or determinations of the IRS or any other taxing authorities have been obtained or sought with respect to the Plan, and the description below is not binding upon the IRS or such other authorities.

The following discussion of federal income tax consequences is based on the Internal Revenue Code, the Treasury Regulations promulgated and proposed thereunder (the "Regulations"), judicial decisions and published, administrative rulings and pronouncements of the IRS as in effect on the date hereof. Legislative, judicial or administrative changes or interpretations enacted or promulgated in the future could alter or modify the analyses and conclusions set forth below. Any such changes or interpretations may be retroactive, and could significantly affect the federal income tax consequences discussed below.

### B. Federal Income Tax Consequences to the Debtors.

#### 1. Reduction of the Debtors' Indebtedness.

The principal amount of the Debtors' aggregate outstanding unsecured or less than fully secured indebtedness will be substantially reduced under the Plan. Generally, outside of bankruptcy, pursuant to Section 108 of the Internal Revenue Code (26 U.S.C.), the cancellation or other discharge of indebtedness triggers ordinary income to a debtor equal to the principal amount (as determined for federal income tax purposes) of the indebtedness forgiven. If debt is discharged in a case under the Code, however, no ordinary income to a debtor generally results. 26 U.S.C. §108(a)(a)(A). Instead, certain tax attributes otherwise available to the debtor are reduced, in most cases by an amount equal to the principal amount of the indebtedness forgiven. Tax attributes subject to reduction include (a) Net Operating Losses ("NOL") and NOL carryovers; (b) most tax credit carryovers; (c) capital losses and capital loss carryovers; (d) the tax basis of the debtor's depreciable and non-depreciable assets, but generally not in an amount greater than the excess of the aggregate tax bases of the property held by the debtor immediately after the discharge over the aggregate of the debtor's liabilities immediately after the discharge; (e) passive activity loss and credit carryovers; and (f) foreign tax credit carryovers. Attribute reduction is calculated only after the Debtors actually receive their discharge and tax for the year of discharge has been determined. Because the 2005 BAPCPA amendments delayed the timing of when individual Chapter 11 debtors receive their discharges until all plan payments are completed, the Debtors' tax attributes are re-vested in the Debtors upon Confirmation of their Plan and will remain available to them in their preparation and calculations on their post-Confirmation income tax returns, prior to the time when they actually receive their discharges.

C.      Federal Income Tax Consequences to Holders of Claims.

      1.      Holders of Claims.

The tax consequences of the Plan to a holder of a Claim will depend, in large part, on their individual circumstances.  Holders of Claims are strongly advised to consult their tax advisors with respect to the tax treatment of their particular Claims under the Plan, including all questions regarding the timing of and their ability to claim any applicable losses on their tax returns.

## V.      CONFIRMABILITY OF THE PLAN

A.      General.

Code Section 1129 sets forth the requirements for the Confirmation of a Chapter 11 Plan of Reorganization.  Among these requirements are that the Court find the Plan is in the "best interest of Creditors" and that the Plan is "feasible."

B.      Liquidation Analysis of the Debtors' Assets/Best Interests of Creditors.

Under Section 1129(a)(7)(A) of the Code, in the absence of the unanimous approval of a proposed Plan by all Creditors, a Plan of Reorganization may not be Confirmed unless the Plan proposes to pay to the members of an impaired Class an amount which, as of the Effective Date, is no less than the amount that would be received if the Debtors were liquidated under Chapter 7 of the Code.  This hypothetical test is known as the "Chapter 7 test" or "best interest of the Creditors test."

The Debtors submit that the Plan "passes" the Chapter 7 test.  That is, the Plan provides for payments to Creditors equal to or exceeding those amounts which Creditors would receive if the Debtors were liquidated under Chapter 7 of the Code.  Being filed and served herewith as Exhibit A is the Debtors' Chapter 7 liquidation analysis of their assets and liabilities as of September 30, 2023.  As reflected therein, when the assets of the Debtors as of the date of their bankruptcy Filing are analyzed in light of their forced sale liquidation values (net of expenses of sale), the value of the Debtors' assets which would be realized through any Chapter 7 liquidation would be far less than the Debtors' liabilities.

Furthermore, if a Chapter 7 liquidation were to occur, the Debtors' estate would be subject to additional administrative and priority expenses entitled to priority over Claims of Unsecured Creditors, including expenses for a Chapter 7 Trustee's commissions and fees and the fees for a Trustee's attorneys and accountants.  Additionally, the proceeds of any sale of assets may be substantially reduced, since a Chapter 7 Trustee would likely seek to liquidate such assets quickly and may lack the Debtors' familiarity with these assets.

C.      Projected Financial Information/Feasibility of the Plan.

As was discussed above, the Debtors have prepared projected post-Confirmation financial forecasts which are attached hereto as Exhibit B.  Those forecasts estimate that the Debtors' projected income will slightly exceed the Debtors' estimated Plan payment obligations.

Accordingly, it is the Debtors' position that their Plan is feasible, within the meaning of Code Section 1129, because their projections demonstrate that they will be able to make all Distributions and Plan payments called for by the Plan.

D. <u>Risk Factors of the Plan</u>.

Distributions to holders of Claims which are to be made pursuant to the Plan are contingent upon many assumptions, some or all of which could serve to preclude the Plan from becoming effective or which could affect the anticipated Distributions. Some of these risks are:

1. The Plan is subject to approval by the various Classes of Creditors entitled to vote under the Code. No assurance can be given that the Plan will be accepted by the requisite number and amount of Creditors or that the Plan will be Confirmed.

2. The financial information contained in this Disclosure Statement has not been subject to audit and is based upon an analysis of the data available to the Debtors at the time of preparation of the Plan and this Disclosure Statement. Although the Debtors have used their best efforts to ensure the accuracy of the financial information contained herein, the Debtors are unable to warrant that the financial information contained herein contains no inaccuracy.

3. No representation can be made as to the accuracy of any forward-looking financial information or revenue projections because, in light of unanticipated events and circumstances, certain assumptions could prove to be either too conservative or too optimistic. The Debtors believe their financial projections to be conservative and wholly supported by their experience and Post-Petition operations, but they are obviously unable to warrant that no unanticipated event will occur which will affect business factors, competitive conditions or actual financial results.

4. The Plan assumes that credit terms and financing will be available to the Debtors in the future as needed. There is no guarantee that financing will be available in the future, or that trade credit terms will be available to the Debtors from vendors and suppliers.

5. The Plan is subject to uncertainties regarding the application of federal income tax laws, as well as state, local and foreign tax laws, to various transactions and events contemplated therein.

## VI.    CONCLUSION AND RECOMMENDATION

It is the Debtors' belief that the Confirmation of their proposed Plan is in the best interest of Creditors as it will result in a greater return to Creditors than would be obtained through a Chapter 7 liquidation or any other option available to the Debtors.  Therefore, the Debtors recommend that their Creditors vote to accept their Plan.

Dated: Gowanda, New York
      November 5, 2023

**JEFFREY D. MENOFF**

By:   /s/ Jeffrey D. Menoff          
        Jeffrey D. Menoff

Dated: Gowanda, New York
      November 5, 2023

**LORI L. MENOFF**

By:   /s/ Lori L. Menoff            
        Lori L. Menoff

Dated: Clarence, New York
      November 6, 2023

**LIPPES MATHIAS LLP**

By: /s/ Daniel F. Brown          
        Daniel F. Brown, Esq.
        Attorneys for the Debtors
        9145 Main Street
        Clarence, New York 14031
        Direct Dial:  (716) 235-5030
        Facsimile:  (716) 565-1920
        E-mail:  dbrown@lippes.com